UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
CONSOLIDATED EDISON COMPANY                                      :
OF NEW YORK, INC.,                                               :
                                                                 :
                                          Plaintiff,             :
                                                                 :
                     -against-                                   :
                                                                 :
ACE AMERICAN INSURANCE COMPANY,                                  :
                                                                 :
                                          Defendant.             :
                                                                 :
-----------------------------------------------------------------X

<table><tr><td>
USDC SDNY<br>
DOCUMENT<br>
ELECTRONICALLY FILED<br>
DOC #: _____<br>
DATE FILED: 5/18/2023
</td></tr></table>

1:21-cv-9216-GHW

MEMORANDUM OPINION &
ORDER

GREGORY H. WOODS, United States District Judge:

Altagracia Ramirez tripped and fell on a sidewalk in the Bronx. She sued the only people she knew to sue—the owner and manager of the adjacent property. They, in turn, sued Consolidated Edison Company of New York, Inc. ("ConEd"), who they believed to have been responsible for work on the sidewalk. ConEd asked the defendant, ACE American Insurance Company ("ACE"), to defend it. ConEd claimed that one of its contractors was responsible for the work on the sidewalk, and that ConEd was covered as an "additional insured" on the contractor's policy. ACE declined to provide a defense, largely because the contractor's work on the sidewalk did not happen "on/about" the date of the accident, but, rather 10 months earlier. Because the ten-month lapse of time between the contractor's work and the accident does not cut off the chain of proximate cause as a matter of law, the facts presented to ACE suggested a reasonable possibility that its named insured was a proximate cause of the accident. As a result, ACE must defend ConEd in Ms. Ramirez's suit.

I.      BACKGROUND

A.      Facts[1]

1.      The Utility and the Contractor:  ConEd and Petmar

ConEd is a utility company that provides electricity, gas and steam in New York City.

Petmar Builders, A Division of Yonkers Contracting Co. Inc. ("Petmar") is a contractor that

provided services to ConEd.  ConEd and Petmar entered into a contract pursuant to which Petmar

would work on ConEd's gas lines in the Bronx.  Defendant's 56.1 Statement ("D's 56.1 Statement"),

Dkt. No. 33, at ¶¶ 13-14.  That contract, described as a "Blanket Purchase Agreement," was a three-

year contract with an effective start date of August 1, 2013 and an effective end date of July 31,

2016.  Id. ¶ 14.

The Blanket Purchase Agreement described the scope of work to be performed by Petmar

under the contract as follows:  "The scope of work includes providing gas qualified mechanics to

provide services on live cast iron, steel, and plastic pipe in addition to laborers and equipment to

perform excavation and pavement removal for Consolidated Edison Company of New York, Inc. . .

. gas distribution system in the Bronx."  Declaration of Erica Kerstein ("Kerstein Decl."), Dkt. No.

31, Ex. 6 at 1.  The Blanket Purchase Agreement was an umbrella contract which provided for

Petmar to conduct a series of projects within its scope within a maximum contract value.  The

Blanket Purchase Agreement did not list specific projects, locations, areas, or dates for Petmar's

work.  D's 56.1 Statement at ¶ 15.

The Blanket Purchase Agreement was subject to ConEd's "Standard Terms and Conditions

for Construction Contracts," which were incorporated into the agreement by reference.  Blanket

Purchase Agreement at 2.  Those Standard Terms and Conditions required Petmar to indemnify

ConEd for, among other things, "all claims, damage, loss and liability . . . for injury to or the death

---

[1] The facts are taken from the parties' Local Rule 56.1 statements and other documents submitted in connection with the parties' summary-judgment motions.  Unless otherwise stated, the facts are undisputed by the parties.

of persons . . . resulting in whole or in part from . . . the performance of the Work by Contractor, any subcontractor or their respective agents, servants, employees or representatives . . . ."  Kerstein Decl., Ex. 7 (the "Standard Terms and Conditions"), ¶ 36.  The Standard Terms and Conditions also required that Petmar obtain general insurance coverage acceptable to ConEd, and that ConEd be named as an additional insured in Petmar's policy.  Standard Terms and Conditions ¶ 37(B) ("The insurance policy or policies shall name Consolidated Edison Company of New York, Inc. . . . as additional insureds with respect to the Work and completed operations.").  Like the Blanket Purchase Agreement, the Standard Terms and Conditions did not list specific projects, locations, areas, or dates for Petmar's work.  D's 56.1 Statement at ¶ 19.

>    **B.    The ACE Policy**

Petmar obtained the insurance coverage required under its contract with ConEd.  The relevant insurance contract for purposes of this opinion was issued by Defendant to Petmar's parent company, Yonkers Contracting Company, Inc. ("Yonkers") for the period from July 1, 2014 through July 1, 2015.  Kerstein Decl., Ex. 9 (the "Policy").  The Policy requires Defendant to pay amounts that the insured becomes legally obligated to pay because of "bodily injury" and "property damage" to which the Policy applies.  *Id.* at ECF p. 19.  The Policy also obligates Defendant to defend the insured "against any 'suit' seeking damages for 'bodily injury' or 'property damage.'"  *Id.* However, the insurer's duty to defend does not extend to suits seeking damages to which the Policy does not apply.  *Id.*  ("However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply.").

An endorsement to the Policy provides for coverage for "additional insureds":

**A.  Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard."

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

Policy at ECF p. 67.  Additional insured status was afforded to any person where "required by insured contract executed prior to loss."  *Id.*  It is undisputed that Petmar's contract with ConEd required insurance and that the contract was entered into prior to the loss that gave rise to this lawsuit.  As a result, ConEd was an "additional insured" under the policy to the extent that the loss was covered by the Policy—which, as discussed below, turns on whether the injury suffered by Ms. Ramirez was caused by Petmar's conduct.  The insurance certificate issued in connection with the Policy identified ConEd as "Additional Insured in accordance with the policy provisions . . . ." Kerstein Decl., Ex. 11.

## C.  The Underlying Action

This case was provoked by a lawsuit filed by Altagracia Ramirez as a result of a slip and fall on the sidewalk next to an apartment building in the Bronx.  Ms. Ramirez filed suit against Plover Development Fund Company, Inc. ("Plover Development") and Plover Apartments, LLC ("Plover Apartments") on or about October 11, 2017 (the "Underlying Action").  D's 56.1 Statement ¶ 1.  In her initial complaint (the "Initial Complaint"), Ms. Ramirez alleged that on April 20, 2015, while she was "lawfully a pedestrian on the sidewalk, adjacent to and abutting the aforesaid premises located at 1175 Gerard Avenue of Bronx City and State, she was caused to trip and fall and sustain severe and

permanent injuries due to the broken, cracked, uneven, raised, depressed, unsafe, hazardous, and dangerous condition on the sidewalk thereat."  Kerstein Decl., Ex. 1, at ¶ 17.

Ms. Ramirez sued Plover Development and Plover Associates, because, she alleged, they owned and managed the building at 1175 Gerard Avenue, and "had the duty and obligation to inspect, manage, maintain and repair the sidewalk adjacent to and abutting" the property.  *Id.* at ¶¶ 11-17.  There are no allegations in the Initial Complaint or in the bill of particulars served by Ms. Ramirez about either ConEd or Petmar—just allegations that a defective condition on the sidewalk next to the building on Gerard Avenue managed by the Plover entities caused her fall.  D's 56.1 Statement ¶ 5.

ConEd was brought into the Underlying Action by Plover Development and Plover Apartments.  The Plover entities filed a third party complaint (the "Plover Third Party Complaint") against ConEd on January 18, 2019.  Kerstein Decl., Ex. 3.  In the Plover Third Party Complaint, they alleged that "on or before April 20, 2015, [ConEd] 'opened the roadway and/or sidewalk for a 'major gas installation and gas repair' at Gerard Avenue from East 167th Street to McClellan Street, Bronx, New York."  *Id.* ¶ 16.  The building managed by Plover is located within that area.  *Id.* ¶ 17.  The Plover Third Party Complaint asserted that "on or before April 20, 2015, [ConEd] made an opening in the sidewalk where plaintiff fell."  *Id.* ¶ 19.  And at on or about the same date, according to the Plover Third Party Complaint, ConEd "placed gravel on the sidewalk where plaintiff fell" and "placed gravel in or about the aforementioned opening in the sidewalk where plaintiff fell."  *Id.* ¶¶ 20-23.

Thus, according to the Plover Third Party Complaint, it was ConEd that caused the dangerous condition that resulted in Ms. Ramirez's injury, not the Plover entities.  The Plover Third Party Complaint made no mention of Petmar.

ConEd answered the Third Party Complaint on February 20, 2019. Kerstein Decl., Ex. 4. ConEd's answer included a counterclaim by ConEd against the Plover entities, asserting that any liability of ConEd to Ms. Ramirez was not its fault, but rather, "will have arisen in whole or in part out of the negligent acts of the defendants/third-party plaintiffs, [Plover Development and Plover Apartments] . . . ." *Id.* ¶ 13. ConEd's answer said nothing about Petmar or its involvement in ConEd's work near the location of Ms. Ramirez's fall.

Petmar did not join the Underlying Action until the fall of 2020 when ConEd filed a third party action against Petmar (the "ConEd Third Party Complaint"). Kerstein Decl., Ex. 5. That happened well after the decision by Defendant not to defend ConEd in connection with the Underlying Action, which will be discussed in the next section of this opinion.

In ConEd's Third Party Complaint, ConEd alleged that prior to the date of Ms. Ramirez's accident, ConEd had contracted with Petmar "to perform certain work and render certain services for Con Edison in and about 1175 Gerard Avenue, Bronx, New York." *Id.* ¶ 4. ConEd alleged that "[o]n *and before* April 20, 2015, [Petmar] performed or was performing work or rendered or was rendering service at 1175 Gerard Avenue, Bronx, New York, as provided for in the aforementioned contract . . . ." *Id.* ¶ 7 (emphasis added). In what may be a somewhat inconsistent description of the timing of Petmar's work, ConEd later alleged that "[o]n *or about* April 20, 2015, [Petmar], was performing work or rendering serviced *or had* performed work or rendered services in accordance with the provisions of the aforementioned contract with Con Edison at or in the vicinity of 1175 Gerard Avenue, Bronx, New York." *Id.* ¶ 12 (emphasis added).

ConEd's Third Party Complaint alleged that Ms. Ramirez's accident occurred in the area "where [Petmar] was performing or had performed work . . . ." *Id.* ¶ 13. Therefore, the ConEd Third Party Complaint asserted, "[i]f the plaintiff sustained the injuries and damages as alleged in the complaint, such injuries and damages were sustained either through the negligence of [Petmar], or

through the negligence of the plaintiff and not through any negligence on the part of Con Edison."
*Id.* ¶ 14.  There are no other facts in the ConEd Third Party Complaint that support its conclusory
assertion that Petmar was negligent other than the mere fact that Petmar did work in the area where
the accident took place.  It does not state what, if anything, Petmar did or failed to do that was
negligent—merely that Petmar had worked in the place where Ms. Ramirez's accident occurred.

D.      **ACE Investigates And Declines to Defend ConEd**

ConEd tendered the defense of the Plover Third Party Complaint to Defendant ACE on
June 2, 2020.  D's 56.1 Statement ¶ 29; Kerstein Decl., Ex. 10 (the "Tender").  In its Tender, ConEd
asserted that ConEd's "investigation reveals that the alleged incident involved work performed by
Petmar at the subject location for Con Edison."  Tender at 1.  In support of the Tender, ConEd
provided ACE a number of documents, including the Plover Third Party Complaint, and ConEd's
answer.

ConEd also provided three other "relevant records."  First was a copy of a "Standard
Purchase Order" between ConEd and Petmar.  Kerstein Decl., Ex. 12.  In the "Notes" section of
that purchase order, it described the scope of work as including "providing gas qualified mechanics
to perform services on live cast iron, steel, and plastic pipe in addition to laborers and equipment to
perform excavation and pavement removal for [ConEd] gas distribution system in the Bronx."  *Id.*
As with the Blanket Purchase Agreement, the purchase order did not identify on its face a specific
project, date or location of the work to be performed.  The second document offered by ConEd
with its Tender was a "street opening permit."  *Id.*

The third document proffered by ConEd with its Tender was a "ConEd Report of Street
and/or Sidewalk Openings, PS 806786."  Kerstein Decl., Ex. 13 (the "ConEd Opening Report").
The ConEd Opening Report indicates that the address of the repair was 1175 Gerard Street between
East 166 and East 167 streets.  *Id.*  The report indicates that it was prepared by "A. Pace" on July 30,

7

14.  *Id.*  But it does not state who "A. Pace" was or who he worked for.  The ConEd Opening

Report indicates that on July 30, 2014, the worker arrived at the job site.  And the ConEd Opening

Report describes the work completed as follows:  "Set up safety cut and caped 3" steel service to

1175 due to contractor damaged pipe . . . over service caped service b/f hole left safe."  *Id.*[2]  The

remarks section of the report states "Cut and caped 3" steel service left safe."  *Id.*

      Between June 2, 2020 and July 27, 2020, ACE conducted an investigation into the alleged

incident and ConEd's Tender.  D's 56.1 Statement ¶ 39.  That process included its own internal

investigation as well as additional correspondence with ConEd.  *Id.*  On June 8, ACE requested

further information from ConEd to allow it to evaluate the Tender.  *Id.* ¶ 38.  One of ACE's

requests in a June 18, 2020 email asked ConEd to confirm that Petmar did work at the site of the

contract, since the documents that they had received allowed them only to "understand the overall

scope of work that the agreement references."  Kerstein Decl., Ex. 14 at ECF 3.  ACE's

representative also asked that ConEd "please provide proof that our insured was providing work at

the site referenced in the complaint *on/about the date of the incident*."  Kerstein Decl., Ex. 14 at ECF 3.

      ConEd provided some documents in response to these questions.  In response, ACE's

representative stopped asking for additional information regarding the location of the incident, but

followed up in a June 22, 2020 email on its request for additional evidence that would show that

Petmar had conducted its work "on/about the date of loss."

> The Street/Sidewalk Opening Report and Job Safety Planning Report that you
> provided for 1175 were signed off for work completed on 7/30/2014.  As per the
> allegations in the complaint, the plaintiff has filed the lawsuit due to injuries
> stemming from an incident that occurred nearly 10 months later on 4/20/2015.
> Again, I kindly ask you to provide proof that our insured was performing work at the
> accident location on/about the date of loss.

*Id.* at ECF 2.

---

[2] The term "b/f" may have many meanings, but in this context, the Court assumes that it refers to "backfill."

ConEd seems to have decided not to provide additional information in response to the request for evidence showing that Petmar's work happened around the date of Ms. Ramirez's accident. Instead, the following day, ConEd responded to the request as follows:

> Con Edison has provided a number of documents demonstrating that your Named Insured performed work for Con Edison at the location where the incident allegedly occurred. Even if your Named Insured completed the work prior to the date of the alleged incident, this does not eliminate the possibility that your Named Insured caused and/or created the defective condition that allegedly caused plaintiff to fall.

*Id.*

As part of its investigation, ACE also received an email from Yonkers about Petmar's work around the location of Ms. Ramirez's accident. The parties provided the Court a fraction of the correspondence with Yonkers. Kerstein Decl., Ex. 15. In a June 24, 2020 email, Dan Mintz, a representative of Yonkers, Petmar's parent company, wrote to John Ahearn, another representative of Yonkers. D's 56.1 Statement ¶¶ 40, 42. Mr. Mintz first described the basics of Ms. Ramirez's allegation about the sidewalk at 1175 Gerard Avenue and informed Mr. Ahearn that ConEd was "seeking defense & indemnification by our insurance carrier per the contract." Kerstein Decl., Ex. 15. In his email, Mr. Mintz can be read to confirm that ConEd's Tender relates to work done by Petmar. He wrote: "It appears their tender is *in fact* related to the 7/30/14 work performed by Petmar . . . ." *Id.* But then he went on to note that the work was "almost 10 months prior to the accident date." *Id.* Mr. Mintz stated that the work order shows that the pipe was cut and capped "by the insured"—i.e. Petmar—and asked Mr. Ahearn if he could provide "a detailed summary of all of the work performed this day . . . ." *Id.*

Mr. Ahearn's response read in full as follows:

> Gentlemen, The opening ticket shows the date we completed our work. We then give the 50-13 form back to CE so they can start the permanent repair process. We do not do this. It is another contractor. We do not maintain the temp repair i.e. Cold patch. Con Ed is supposed to expedite the permanent repair. I don't think 10 months is acceptable. We will go back at times to maintain temp repairs if complaints are called in and we are dispatched by Con Ed.

*Id.* Mr. Ahearn does not contest Mr. Mintz's statement that the incident was "in fact" related to the work done by Petmar. Mr. Ahearn disclaims that Petmar is responsible for a permanent repair of the sidewalk. But it is a fair interpretation of his statement that Petmar did a "temp repair," or "cold patch" at the work site, with the expectation that ConEd would return for the permanent repair. Petmar would go back to "maintain temp repairs if complaints are called in . . . ."

ACE declined to defend ConEd. ACE sent ConEd a letter on July 27, 2020 explaining the basis for its conclusion that "[a]fter examining the documents provided along with the ACE policy and all relevant forms, Chubb finds that there is no coverage afforded to ConEd under the Policy for this loss." Kerstein Decl., Ex. 16 (the "Declination Letter"). The Declination Letter pointed to the investigation conducted by Yonkers, and acknowledged that "Yonkers['] investigation revealed that the alleged incident involved work performed by Petmar, for Con Edison, 10 months before the date of loss." *Id.* at 1. "Here, Yonkers has confirmed that they completed the job 10 months prior and the job was signed off." *Id.* Because Petmar's work at the site was completed 10 months before the accident "and the job was signed off," in ACE's view, there was no coverage. *Id.* ("As such, there is no coverage for Con Ed under the Policy."). *Id.*

On October 15, 2020—after ACE declined coverage—Mr. Mintz sent another email that was received by a representative at Chubb. Kerstein Decl. ¶ 17. This email confirmed the substance of his and Mr. Ahearn's earlier correspondence that had been provided to ACE before its decision to decline coverage. Mr. Mintz wrote:

> Our internal investigation revealed that Petmar was at this site 10 months prior to the accident. In addition, the Project Manager, John Ahearn, confirmed that Petmar only did temporary work/patching so they can start the permanent repair process. We do not maintain the temp repair i.e. Cold patch. Con Ed is supposed to expedite the permanent repair.

*Id.* Mr. Mintz stated that he had received service of a complaint by ConEd bringing Petmar into the action as a third-party defendant and asked that the insurer appoint counsel to represent Petmar.

E.     **Procedural History**

On August 31, 2021, Con Edison initiated this action in the Supreme Court for the State of New York.  Kerstein Decl., Ex. 18.  On November 8, 2021, Defendant removed the case to this Court.  Dkt. No. 1.  Between January 2022 and June 2022, the parties engaged in limited discovery.  D's 56.1 Statement ¶ 46.  Then they moved to the motion practice that is being resolved by this opinion.

On September 2, 2022, ConEd and ACE filed cross-motions for summary judgment.  Dkt. Nos. 26, 30.  ConEd's motion for summary judgment requests a determination by the Court that ACE has a duty to defend it in the Underlying Action.  Dkt. No. 28 ("P's Mem.").  ConEd's argument at base is relatively straightforward—Petmar did work at the site of Ms. Ramirez's accident.  *Id.* at 9.  "Petmar may have left the area of the accident in a defective condition or its work was performed negligently causing a depression in the sidewalk."  *Id.*  As a result, ConEd argues, "there exists a reasonable possibility that the work of Petmar causes or contributed to the accident."  *Id.*

ACE argues that it has no duty to defend ConEd because there is no reasonable possibility that Ms. Ramirez's accident was proximately caused by the negligence of Petmar.  Dkt. No. 32 ("D's Mem.").  ACE's argument points to the lack of non-conclusory allegations in the pleadings in the Underlying Action supporting the conclusion that Petmar acted negligently.  ACE focuses in particular on the 10-month gap between the date of the accident and the date on which Petmar did its work at the site.  *Id.* at 14-15.  It also points to the ConEd Opening Report's assertion that the project site was "left safe" to support the conclusion that Petmar was not the proximate cause of Ms. Ramirez's injuries and that, therefore, Con Ed is not entitled to a defense.

## II.    LEGAL STANDARD

### A.    Motions for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, and he or she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quotation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quotation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). "Assessments of credibility and choices between conflicting

versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quotation omitted).

Still, "[t]he possibility that a material issue of fact may exist does not suffice to defeat the motion; upon being confronted with a motion for summary judgment the party opposing it must set forth arguments or facts to indicate that a genuine issue—not merely one that is colorable—of material fact is present." *Gibson v. Am. Broad. Cos.*, 892 F.2d 1128, 1132 (2d Cir. 1989).

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cnty.*, 661 F.3d 128, 139 (2d Cir. 2011)); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.") (citation omitted).

B.       **The Declaratory Judgment Act**

The Declaratory Judgment Act is used frequently to resolve insurance-coverage disputes. *See, e.g., U.S. Specialty Ins. Co. v. Nationwide Mut. Ins. Co.*, No. 19-CV-7884 (MKV), 2020 WL 2489078, at *2 (S.D.N.Y. May 14, 2020) (citing *Assoc. Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir. 1992)).  The Declaratory Judgment Act provides in pertinent part the following:  "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  A federal court may exercise jurisdiction over an action for declaratory judgment only if there "exists . . . an 'actual controversy.'" *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 177 (2d Cir. 2001) (quoting 28 U.S.C. § 2201(a)).  A justiciable declaratory judgment claim must be "'definite and

concrete, touching the legal relations of parties having adverse legal interests,'" as well as "'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 S. Ct. 764, 166 L.Ed.2d 604 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S. Ct. 461, 81 L. Ed. 617 (1937)).

"The Declaratory Judgment Act by its express terms vests a district court with discretion to determine whether it will exert jurisdiction over a proposed declaratory action or not." *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003).

> [T]o guide the exercise of discretion in Declaratory Judgment Act cases . . . [the Second Circuit has] articulated a simple test that asks (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty.  *See Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969).  Other circuits have built upon this test, to ask also: ([3]) whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; ([4]) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and ([5]) whether there is a better or more effective remedy.

*Dow Jones*, 346 F.3d at 359–360 (citations omitted).

Here, there is no dispute regarding the justiciability of this dispute under the Declaratory Judgment Act.  Presumably ConEd is incurring defense costs as a result of ACE's decision to decline coverage.  And there is no question that judgment by the Court regarding the scope of ACE's obligations under the Policy will "serve a useful purpose" and provide "relief from uncertainty." *Id.*

## C.    The Duty to Defend

Under New York law[3], an insurer's duty to defend is "exceedingly broad." *Auto. Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137 (2006).  "The duty to defend is liberally construed and is broader

---

[3] The parties' briefs assume that New York law applies here.  That implied consent is sufficient to establish choice of law.  *See Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12-cv-7908 (PAE), 2013 WL 2631043, at *2 n.3 (S.D.N.Y. June 11, 2013).

than the duty to indemnify 'in order to ensure [an] adequate . . . defense of [the] insured,' without regard to the insured's ultimate likelihood of prevailing on the merits of a claim." *Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co.*, 16 N.Y.3d 257, 264 (2011) (quoting *Gen. Motors Acceptance Corp. v. Nationwide Ins. Co.*, 4 N.Y.3d 451, 456 (2005)).

"[A]n insurer will be called upon to provide a defense whenever the allegations of the complaint 'suggest . . . a reasonable possibility of coverage.'" *Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 141 (2d Cir. 2014) (quoting *Auto. Ins. Co. of Hartford*, 7 N.Y.3d at 137). "This standard applies equally to additional insureds and named insureds." *Regal Const. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 15 N.Y.3d 34, 37, 930 N.E.2d 259, 261–62 (2010).

Importantly, it is "the facts which are pleaded, not the conclusory assertions," that determine whether there is a duty to defend. *Allstate Ins. Co. v. Mugavero*, 79 N.Y.2d 153, 162, 581 N.Y.S.2d 142, 589 N.E.2d 365 (1992) (emphasis added). "Unsubstantiated speculation about facts that may be alleged or adduced in the underlying litigation does not trigger a duty to defend." *Spandex House, Inc. v. Hartford Fire Ins. Co.*, 407 F. Supp. 3d 242, 249 (S.D.N.Y. 2019), *aff'd*, 816 F. App'x 611 (2d Cir. 2020) (internal quotation and citation omitted). Additionally, even where the underlying complaint does not itself suggest a reasonable possibility of coverage, an insurer has a duty to defend if "underlying facts made known to the insurer create a reasonable possibility that the insured may be held liable for some act or omission covered by the policy." *Fitzpatrick v. Am. Honda Motor Co.*, 78 N.Y.2d 61, 70, 571 N.Y.S.2d 672, 575 N.E.2d 90 (1991) (internal quotation marks omitted).

"If, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be." *Euchner-USA*, 754 F.3d at 141 (internal quotation marks omitted). "Any doubt as to whether the allegations state a claim within the coverage of the policy must be resolved in favor of the insured and against the carrier." *Id.* "[W]here the theory of liability on which the injured party is proceeding cannot be

15

determined from the facts pleaded, the insurer must defend.  But where it can be determined from the factual allegations that no basis for recovery within the coverage of the policy is stated in the complaint, [a court] may sustain [the insurer's] refusal to defend."  *Allstate Ins. Co.*, 79 N.Y.2d at 162–63 (internal quotations and citations omitted).  "[A]n examination of whether an insurer has a duty to defend must focus on the information made available to the insurer and the insurer's actual knowledge at the time a request for a defense was tendered in light of the language of the policy."  *Massachusetts Bay Ins. Co. v. Penny Preville, Inc.*, No. 95-cv-4845, 1996 WL 389266, at *5 (S.D.N.Y. July 10, 1996).

The duty to defend is a lasting obligation that continues "until it is determined *with certainty* that the policy does not provide coverage."  *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 620 (2d Cir. 2001).

> There are at least three kinds of uncertainty that can give rise to such a duty to defend.  The first is factual:  did the injury occur in a time, place, or way that is covered by the policy?  The second is legal:  will the cases governing the insurance policy be read to impose coverage in a given situation?  The third arises from the existence of *contra proferentem*:  will the terms of the contract of insurance be deemed to give rise to an ambiguity that must be read against the insurer or will they be held to be clear enough to avoid the presumption?  Each of these uncertainties will ultimately be resolved by courts or juries—and often in favor of the insurer, thereby precluding coverage and the duty to indemnify.  But until they are, the insurer cannot avoid its duty to defend.

*Id.*  "Under some circumstances, the allegations contained in the complaint against the insured will by themselves eliminate all potential doubt and relieve the insurer of any duty to defend."  *Id.* at 621 (citing *George Muhlstock & Co. v. Am. Home Assurance Co.*, 502 N.Y.S.2d 174, 179 (1st Dep't 1986) ("[W]here the facts alleged plainly do not bring the case within the coverage of the policy, there is no obligation to defend.")).

### D.    Coverage of an Additional Insured

The parties' dispute in this case turns on whether ConEd qualifies as an "additional insured" under the Policy.  The answer to that question turns on the language of the Policy, which requires

that the covered liability for bodily injury be "caused, in whole or in part," by Petmar—the named insured.  Policy at ECF 67.  The meaning of this language, as contained in the Policy, is "well-established as a matter of New York law."  *Ohio Sec. Ins. Co. v. Travelers Indem. Co. of Conn.*, No. 19-CV-1355 (AJN), 2021 WL 797670, at *3 (S.D.N.Y. Mar. 1, 2021) (Nathan, J.) (citing *Burlington Ins. Co. v. N.Y.C. Transit Auth.*, 29 N.Y.3d 313, 317 (2017)).  "[W]here an insurance policy is restricted to liability for any bodily injury 'caused . . . ' by the 'acts or omissions' of the named insured," as here, "the coverage applies to injury proximately caused by the named insured."  *Burlington Ins. Co.*, 29 N.Y.3d at 317.  Thus, insurance provisions with this language only "protect additional insureds from vicarious liability for the named insured's negligence."  *Ohio Sec. Ins. Co.*, 2021 WL 797670, at *3 (citing *Burlington Ins. Co.*, 29 N.Y.3d at 326).

## III.   DISCUSSION

### A.    There Is a Reasonable Possibility that Petmar's Conduct Caused the Accident

The information known to ACE at the time of its decision to decline coverage indicated a reasonable possibility that Petmar's act proximately caused Ms. Ramirez's injuries.  As a result, ACE has a duty to defend ConEd in the Underlying Action.

As described above, the investigation by Yonkers confirmed that Petmar worked at the location of Ms. Ramirez's accident.  Chubb's declination letter referred to that fact.  Declination Letter at 1 ("Yonkers['] investigation revealed that the alleged incident involved work performed by Petmar . . . .").  The Yonkers' investigation also revealed that Petmar had completed a temporary patch to the surface in that location—a so-called "cold patch."  It also revealed that ConEd was expected to complete a permanent repair of the site, but that it had failed to do so before the date of Ms. Ramirez's accident.  Kerstein Decl., Ex. 15.

Ms. Ramirez alleged that she fell because of a defective condition in the sidewalk.  The Plover Third Party Complaint provided more information about the alleged cause of the accident—

namely that ConEd had "placed gravel on the sidewalk where plaintiff fell" and "placed gravel in or about the aforementioned opening in the sidewalk where plaintiff fell."  Plover Third Party Complaint ¶¶ 20-23.

From this series of facts, ACE had actual knowledge of facts indicating that Petmar had worked at the site of the accident, that Petmar had prepared a temporary patch, and that ConEd had not completed a permanent patch before the date of Ms. Ramirez's accident.  The Plover Third Party Complaint alleged that the cause of her fall was gravel placed at the site of the accident.  The Yonkers investigation suggested that the temporary patch complained of in the Plover Third Party Complaint had been created by Petmar, not ConEd.  These facts were sufficient to indicate that Petmar had engaged in conduct—opening and temporarily patching the sidewalk—that gives rise to a risk that corresponds to the harm that ultimately took place—Ms. Ramirez tripping and falling on the sidewalk where the work was done.  In other words, they are sufficient to raise a reasonable possibility that Petmar's conduct was the proximate cause of Ms. Ramirez's injury.

That there was a 10-month delay between the date of Petmar's work at the site and Ms. Ramirez's accident does not prevent the Court from concluding that these facts indicate a reasonable possibility that Petmar's conduct was a proximate cause of the accident.  In this litigation, ACE, like its representatives who originally declined to defend ConEd, focused heavily on that 10-month lapse of time.  But ACE's argument that Petmar must have done its work on or about the time of the accident is misguided:[4]  the passage of time between a tort-feasor's conduct and an accident does not terminate proximate cause as a matter of law.  "The mere fact that a period of

---

[4]  Given that the evidence presented here shows that Petmar worked at the site some 10 months before Ms. Ramirez's accident, the Court appreciates ACE's skepticism regarding the accuracy of the allegation in the ConEd Third Party Complaint that "*[o]n or about* April 20, 2015, [Petmar], was performing work or rendering serviced *or had* performed work or rendered services in accordance with the provisions of the aforementioned contract with Con Edison at or in the vicinity of 1175 Gerard Avenue, Bronx, New York."  ConEd Third Party Complaint ¶ 12 (emphasis added).  However, the accuracy of this allegation in the third-party complaint is not material to whether the facts presented to ACE raised the reasonable possibility that Petmar's conduct caused the accident.  And the Court observes that the allegation does not state categorically state that Petmar's work happened on or about April 20; it contemplates that Petmar was performing or "had" performed work.

time has elapsed between the negligent act and the injury will not prevent the former from being regarded as the proximate cause of the latter.  It is recognized that through lack of care a person may set in motion forces which touch the person or property of another only after a long interval of time and then only through new and fortuitous circumstances."  *Hoggard v. Otis Elevator Co.*, 52 Misc. 2d 704, 707–08, 276 N.Y.S.2d 681, 687 (Sup. Ct. 1966), *aff'd*, 28 A.D.2d 1207, 285 N.Y.S.2d 262 (1967).

"The overarching principle governing determinations of proximate cause is that a defendant's negligence qualifies as a proximate cause where it is a substantial cause of the events which produced the injury."  *Hain v. Jamison*, 28 N.Y.3d 524, 528–29 (2016) (internal quotations and citations omitted).  "Stated differently, proximate cause will be found lacking where the original negligent act merely furnished the occasion for—but did not cause—an unrelated act to cause injuries not ordinarily anticipated."  *Id.* at 529-30 (internal quotations and citations omitted).  "Proximate cause is, at its core, a uniquely fact-specific determination, and [d]epending upon the nature of the case, a variety of factors may be relevant in assessing legal cause."  *Id.* at 530 (internal quotations and citations omitted).  The passage of time between the negligent act and the event resulting in the injury is merely one of those many factors.  *Id.*  "The relevance of each factor will vary depending upon the factual circumstances presented, but the most significant inquiry in the proximate cause analysis is often that of foreseeability.  Thus, where the risk of harm created by a defendant's conduct corresponds to that which actually results—absent an extraordinary intervening act or significant facts weighing in favor of attenuation—it cannot be said, as a matter of law, that a defendant's negligence merely furnished the occasion for the harm."  *Id.*

Here, the risk of harm created by Petmar's conduct in creating a temporary repair at the sidewalk where Ms. Ramirez fell corresponds to the injury.  The parties have not presented any alleged intervening act between Petmar's patch job and Ms. Ramirez's accident.  The facts may suggest that ConEd negligently failed to install a permanent repair promptly, but this is not the kind

of intervening act that the Court can conclude as a matter of law terminates the chain of proximate causation between Petmar's act and Ms. Ramirez's accident.  The mere passage of time is insufficient to allow the Court to conclude that the chain of proximate causation has been severed—much less that the information presented to ACE was insufficient to indicate a reasonable possibility that Petmar's conduct was a proximate cause of Ms. Ramirez's injury.

Similarly, ACE makes too much of the fact that the ConEd Opening Report states that the location was "left safe."  That a worker created a document stating that his work was left safe does not definitively establish that the work was in fact safe.

ACE's briefing of this motion was strong, but failed to focus on the facts revealed by Yonkers' investigation.  ACE's arguments that the allegations in the Initial Complaint and the Plover Third Party Complaint do not provide a basis for invoking a duty to defend by ACE are sound. Similarly, ACE makes a reasonable argument regarding the conclusory nature of the allegations in the ConEd Third Party Complaint, because the scope of work contained in the Blanket Purchase Agreement by itself did not support the conclusion that Petmar did work at the location of Ms. Ramirez's accident.  Dkt. No. 37 ("D's Opp.") at 9-10.  These arguments do not carry the day, again, because the Yonkers investigation provided facts that supported the conclusion that Petmar did a temporary patch at the location of the accident.

But the Court pauses to comment on one argument presented by Defendant that appears to rely on a misconstruction of the Court of Appeals' decision in *Allstate Ins. Co. v. Mugavero*, 79 N.Y.2d 153 (1992).  ACE cited to that decision in support of an argument that "ConEd's own self-serving allegations, after ACE denied coverage, and a year and a half after Plover's third-party complaint was filed against ConEd, should not be considered by the Court in determining ACE's duty to defend." D's Opp. at 9 (citing *Allstate*, 79 N.Y. 2d at 162).  *Allstate* does not stand for the broad proposition that a court cannot consider the factual allegations contained in a third-party complaint filed by the

party seeking coverage, as ACE argues.  A court may—and an insurer must—consider the allegations contained in a third party complaint brought in the underlying action by a plaintiff in a coverage action.  *See All State Interior Demolition Inc. v. Scottsdale Ins. Co.*, 168 A.D.3d 612, 613 (N.Y. App. Div., 1st Dep't 2019); *Axis Constr. Corp. v. Travelers Indem. Co. of Am.,* No. 220CV1125DRHARL, 2021 WL 3912562, at *4–5 (E.D.N.Y. Sept. 1, 2021) ("The insurer must also consider 'judicial admissions in the insured's responsive pleadings in the underlying tort action or other formal submissions in the current or underlying litigation to confirm or clarify the nature of the underlying claims.'  That includes a 'third-party complaint brought in the underlying action by plaintiffs herein,' *i.e.*, allegations pleaded in the underlying action by the plaintiff in the coverage action.") (internal citations omitted) (quoting *All State Interior Demolition, Inc.*, 168 A.D.3d at 613)).

*Allstate* stands for the proposition that a court should consider the facts pleaded in a complaint, not merely a party's conclusory characterization of the conduct.  *Allstate*, 79 N.Y.2d at 162-63.  But *Allstate* cannot be read to support the proposition that well-pleaded facts presented in a third-party complaint should be disregarded merely on the basis that the insurer believes them to be self-serving.  After all, "[i]f, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be."  *Auto. Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137, 850 N.E.2d 1152, 1155 (2006).

## IV.    CONCLUSION

Because the underlying facts suggest a reasonable possibility of coverage, ACE has a duty to defend ConEd in the Underlying Action.  Accordingly, ConEd's motion for summary judgment is GRANTED, and ACE's motion for summary judgment is DENIED.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 26 and 30.

SO ORDERED.

Dated:  May 18, 2023
New York, New York

_____
GREGORY H. WOODS
United States District Judge